UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

NICHOLAS FITTS and LORRAINE FITTS,

Plaintiffs,

vs.

CA 07 – 147 ML
Jury Trial Requested

KING RICHARD'S AUTO CENTER, INC,
d/b/a East Providence Mitsubishi,

Defendant.

---

**Plaintiffs' Statement of Claims Pursuant to Local Rule 16**

## I. Facts

In the fall of 2006, the Plaintiffs bought a 2002 Ford Focus from East Providence Mitsubishi. The Plaintiffs traded-in a 2001 Ford Taurus and obtained a loan to pay for the Focus.

Several days after taking possession of the Focus, the Plaintiffs returned it to the dealership, signed new paperwork purporting to trade in the Taurus for a 2002 Mercedes, and drove home with the Mercedes.

The Plaintiffs had negative equity in the Taurus when they traded it in; they owed more on the Taurus than it was worth.

In association with the loan for the Mercedes, the federal Truth In Lending Act required the dealer to make certain disclosures to the Plaintiffs. At this point, this case hinges on whether or not the dealer made the disclosures properly.

## II. Other Potential Claims

Plaintiffs' Counsel has advised the Defendant that his clients contend the Mercedes was a lemon unfit for sale to consumers at the time they bought it and that they do not want to keep it. Counsel has further advised the Defendant that this Truth In Lending action was brought because he believed it was his clients' strongest claim and he wanted to try to resolve this dispute without anyone incurring unnecessary legal expenses. If this matter proceeds, counsel may amend the Complaint to include claims based on breach of contract and violation of the state Unfair and Deceptive Trade Practices Act for selling a defective car.

Counsel also intends to investigate the financing and titling of the Ford Focus to determine whether that involved any violations of the applicable state titling rules, the federal Odometer Act, the federal Equal Credit Opportunities Act and/or the federal fair Credit Reporting Act.

## III. Elements Plaintiffs Must Prove

Based on the Defendant's answer, to prevail on the pending Truth In Lending Act (TILA) claim the Plaintiffs must still prove:

1) East Providence Mitsubishi was a "creditor" within the meaning of TILA;
2) East Providence Mitsubishi did not properly disclose the negative equity in the Taurus in violation of TILA (15 USC 1605), 12 CFR 226.2, Regulation Z and the Final Rule of the Board of Governors of the Federal Reserve System issued regarding the disclosure of

negative equity which is found at 63 Fed. Reg. 16669. (Attached. *See especially page 16674*.)

Nicholas Fitts and
Lorraine Fitts,
By their Attorney,

/s/________________________
John T. Longo, Esq./#4928
681 Smith Street, Suite 201
Providence, RI 02908
(401) 272-2177
Fax (401) 274-5433
jtlongo@yahoo.com

**Certificate of Service**

I certify that on ____6/4/2007_____ I electronically filed the above Statement with the Clerk of the federal District Court for this District of Rhode Island using the CM/ECF System. The following participants received notice electronically:

michael@desistolaw.com
Michael A. DeSisto, Esq.
DeSisto Law
P.O. Box 2563
Providence, RI 02906-2563

/s/________________________
John T. Longo, Esq./#4928
jtlongo@yahoo.com

# Rules and Regulations

Federal Register

Vol. 63, No. 65

Monday, April 6, 1998

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## DEPARTMENT OF ENERGY

### Office of Energy Efficiency and Renewable Energy

### 10 CFR Part 430

**[Docket No. EE–RM–94–230A]**

**RIN 1904–AA68**

### Energy Conservation Program for Consumer Products: Test Procedure for Clothes Washers and Reporting Requirements for Clothes Washers, Clothes Dryers, and Dishwashers; Correction

**AGENCY:** Office of Energy Efficiency and Renewable Energy, Department of Energy.

**ACTION:** Correcting amendments.

**SUMMARY:** This document contains corrections to a final rule for the clothes washer test procedures published on Wednesday, August 27, 1997 (62 FR 45484). It corrects the introductory note to the new clothes washer test procedure which will be used to analyze, and will apply to, anticipated revisions to the existing clothes washer energy conservation standards.

**EFFECTIVE DATE:** This rule is effective April 6, 1998.

**FOR FURTHER INFORMATION CONTACT:**
Bryan Berringer, U.S. Department of Energy, Energy Efficiency and Renewable Energy, Mail Station EE–43, Forrestal Building, 1000 Independence Avenue, SW, Washington, DC 20585–0121, (202) 586–0371, E-mail: Bryan.Berringer@HQ.DOE.GOV
Edward Levy, Esq., U.S. Department of Energy, Office of General Counsel, Mail Station GC–72, Forrestal Building, 1000 Independence Avenue, SW, Washington, DC 20585–0103, (202) 586–9507, E-mail: Edward.Levy@HQ.DOE.GOV

**SUPPLEMENTARY INFORMATION:**

### Background

The final regulation that is the subject of these corrections, Appendix J1 of Subpart B to 10 CFR Part 430, sets forth a new test procedure for clothes washers. Department of Energy promulgated this new test procedure for use in considering revision of the current clothes washer energy conservation standards, and for use, upon the effective date of such revision, in determining compliance with such standards and in making representations concerning clothes washer efficiency.

### Need for Correction

As published, the introductory language in Appendix J1 may create confusion as to how the new test procedure is to be employed, and does not clearly reflect the intent in promulgating the test procedure.

### List of Subjects in 10 CFR Part 430

Administrative practice and procedure, Energy conservation, Household appliances.

## PART 430—ENERGY CONSERVATION PROGRAM FOR CONSUMER PRODUCTS

Accordingly, 10 CFR part 430 is corrected by making the following correcting amendment:

1. The authority citation for part 430 continues to read as follows:

**Authority:** 42 U.S.C. 6291–6309.

### Appendix J1 to Subpart B of Part 430 [Corrected]

2. The ''Note'' immediately following the heading for Appendix J1 to Subpart B of Part 430 is revised to read as follows:

**Note:** Appendix J1 to Subpart B of part 430 is informational. It will not be used for determining compliance with standards, or as a basis for representations, until amended energy conservation standards for clothes washers at 10 CFR 430.32(g) become effective.

Issued in Washington, DC, on April 1, 1998.

**Dan W. Reicher,**

*Assistant Secretary, Energy Efficiency and Renewable Energy.*

[FR Doc. 98–8951 Filed 4–3–98; 8:45 am]

BILLING CODE 6450–01–P

## FEDERAL RESERVE SYSTEM

### 12 CFR Part 226

**[Regulation Z; Docket No. R–0992]**

### Truth in Lending

**AGENCY:** Board of Governors of the Federal Reserve System.

**ACTION:** Final rule; official staff interpretation.

**SUMMARY:** The Board is publishing revisions to the official staff commentary to Regulation Z (Truth in Lending). The commentary applies and interprets the requirements of Regulation Z. The update addresses increased rates for open-end plans triggered by events such as late payments or exceeding credit limits. It provides guidance on deferred payment transactions in open-end plans. It also addresses how creditors may determine whether credit is an open-end plan or a closed-end transaction. In addition, the update discusses issues such as the treatment of annuity costs in reverse mortgage transactions and transaction fees imposed on checking accounts with overdraft protection.

**DATES:** This rule is effective March 31, 1998. Compliance is optional until October 1, 1998.

**FOR FURTHER INFORMATION CONTACT:** For Subparts A and B (open-end credit), Jane E. Ahrens, Senior Attorney, or Obrea O. Poindexter, Staff Attorney; for Subparts A, C, and E (closed-end credit and reverse mortgages), Ms. Ahrens or James A. Michaels, Senior Attorney, or Michael E. Hentrel, Staff Attorney; Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, at (202) 452–3667 or 452–2412; for users of Telecommunications Device for the Deaf (TDD) *only*, Diane Jenkins at (202) 452–3544.

**SUPPLEMENTARY INFORMATION:**

### I. Background

The purpose of the Truth in Lending Act (TILA; 15 U.S.C. 1601 *et seq.*) is to promote the informed use of consumer credit by providing for disclosures about its terms and cost. The act requires creditors to disclose the cost of credit as a dollar amount (the finance charge) and as an annual percentage rate (the APR). Uniformity in creditors' disclosures is intended to assist consumers in

comparison shopping. The TILA requires additional disclosures for loans secured by a consumer's home and permits consumers to rescind certain transactions that involve their principal dwelling. The act is implemented by the Board's Regulation Z (12 CFR Part 226). The Board's official staff commentary (12 CFR Part 226 (Supp. I)) interprets the regulation, and provides guidance to creditors in applying the regulation to specific transactions. The commentary is a substitute for individual staff interpretations; it is updated periodically to address significant questions that arise.

In December, the Board published proposed amendments to the commentary to Regulation Z (62 FR 64769, December 9, 1997). The Board received about 110 comments. Most of the comments were from financial institutions, retail merchant associations, and other creditors. About a dozen comments were received from state attorneys general or other agencies, and consumer representatives. Overall, commenters generally supported the proposed amendments. Views were mixed on a few comments, and there was broad industry opposition to the comment addressing the definition of open-end credit.

Except as discussed below, the commentary is being adopted as proposed; some technical suggestions or concerns raised by commenters are addressed. Compliance is optional until October 1, 1998, the effective date for mandatory compliance.

## II. Commentary Revisions

*Subpart A—General*

Section 226.2—Definitions and Rules of Construction

*2(a) Definitions*

*2(a)(2) Advertisement*

Comment 2(a)(2)–1 is adopted as proposed with minor revisions for clarification. The comment clarifies that communications promoting new credit transactions or open-end credit plans, such as promotions to switch from a regular to a premium bank card, are advertisements, including promotions by on-line messages such as on the Internet. Communications encouraging additional or different uses of an existing credit account are not advertisements.

*2(a)(18) Downpayment*

Under Regulation Z, the term ''downpayment'' refers to an amount paid to a seller to reduce the ''cash price'' in a credit sale transaction. Comment 2(a)(18)–3 gives guidance on how a creditor discloses the downpayment if a trade-in is involved in the sale and if the amount of an existing lien exceeds the value of the trade-in. The comment clarifies that creditors should disclose the downpayment as zero and not a negative amount. The comment addresses a credit sale and financed downpayment treated as a single transaction; it does not affect creditors' ability to disclose them as two transactions.

Some commenters asked for further clarification about how to reflect costs associated with a ''negative downpayment,'' illustrated in the comment by an automobile with an existing lien of $10,000 and a trade-in value of $8,000; guidance is provided in a revision to comment § 226.18(c)–2.

*2(a)(20) Open-end Credit*

The proposal addressed two standards for determining whether credit is properly characterized as an open-end plan or a closed-end transaction. Comment 2(a)(20)–3 listed a number of factors that creditors should consider when determining whether they ''reasonably contemplate repeated transactions,'' and comment 2(a)(20)–5 provided guidance on whether a credit line is ''reusable.''

The Board received a substantial number of comments regarding these proposed revisions. Most of the comments addressing the issue were from industry representatives, and they opposed the proposal. Many industry commenters acknowledged that some credit is improperly characterized as open-end; however, they opposed the proposal on procedural and substantive grounds. Procedurally, some recommended that the Board not address the issue in the commentary. Substantively, commenters expressed concern that the factors appeared to shift the focus from the creditor's plan as a whole to an analysis of individual transactions. Most commenters believed that, as stated, the proposed factors in comment 2(a)(20)–3 were not relevant to determining whether a creditor can reasonably contemplate repeated transactions. They expressed concern that the proposed interpretation could have had unintended consequences, because in attempting to address what can be viewed as a narrow problem, the proposed interpretation could apply to credit products that are legitimately and unquestionably open-end transactions.

The Board believes that the analysis of whether a creditor reasonably contemplates repeated transactions should be based on the creditor's plan as a whole; the proposal was not meant to shift that focus. While the application of the factors as proposed could be viewed as overly broad, factors such as those articulated in the proposal could bear directly, depending on the facts and circumstances, on a determination of whether credit can properly be characterized as open-end. Assume, for example, that a creditor establishes an open-end credit plan primarily for the financing of an infrequently purchased product or service, that the credit limits established for much of its customer base are close to the cost of that product or service, and that the creditor has little hard information of repeated transactions by much of its customer base. Read together, these assumed facts could have direct relevance on the issue of whether the plan comports with the Congress's intent that the Truth in Lending disclosures should show consumers the cost of the credit transaction for ''infrequently purchased products.''

The Board recognizes that credit granting practices have changed significantly since the TILA was enacted in 1968. There has been a gradual shift to open-end credit products. These products have become commonplace in large measure because of the operational convenience for creditors. They also offer advantages of flexibility to consumers, who can draw on funds incrementally or finance purchases as needed and can repay as their circumstances permit. At the same time, the Board believes that concerns about some transactions being mischaracterized as open-end plans are legitimate concerns. For example, the Board received from nonindustry commenters documentation of transactions being characterized as open-end plans that involved the financing of used automobiles and the door-to-door credit sales of satellite dishes, water treatment systems, and home improvement contracts.

In seeking to address the legitimate concerns expressed by industry about the proposed interpretation of Truth in Lending while dealing effectively with potential abuses, however, the Board has found it difficult to establish a clear rule that differentiates between spurious and legitimate open-end credit. The Board considered revising the proposal based on the comments received, to narrow the breadth of the factors articulated in the proposal. The Board ultimately determined, however, that to do so without the benefit of further public comment could unnecessarily raise uncertainties for legitimate open-end programs while not reaching the creditor abuses. Consequently, the Board has withdrawn the proposed

Federal Register / Vol. 63, No. 65 / Monday, April 6, 1998 / Rules and Regulations 16671

revisions to the commentary at this time, except with regard to an objective analysis which was addressed by proposed factor E.

Each creditor's credit product may differ based on the type of business, the nature or variety of products or services available for purchase, and the creditor's relationship with its customers. Even so, the determination of whether a creditor can reasonably contemplate repeated transactions requires an objective analysis. Accordingly, comment 2(a)(20)–3 has been revised to clarify this interpretation by adding a direct reference to the need for an objective analysis in reaching a determination regarding repeated transactions.

*2(a)(24) Residential Mortgage Transaction*

The comments are adopted as proposed. Comment 2(a)(24)–5 is revised from the existing comment for clarity, without substantive change. Comment 2(a)(24)–7 clarifies that the definition of a residential mortgage transaction includes a loan for financing the construction of a primary dwelling on land already owned by the consumer.

Section 226.4—Finance Charge

*4(a) Definition*

*4(a)(2) Special Rule: Closing Agent Charges*

Comment 4(a)(2)–2 is revised to address charges to conduct a closing for a real estate-secured transaction. The addition is intended to reflect the rule for excluding closing costs from the finance charge under § 226.4(c)(7); creditors may exclude from the finance charge a lump-sum settlement or closing fee that includes a charge for conducting or attending a closing if the lump-sum fee is primarily for services listed in § 226.4(c)(7). The entire lump-sum may be excluded from the finance charge even if it includes incidental costs for services that are otherwise considered finance charges. The comment clarifies that charges attributed to conducting or attending the closing are finance charges and may not be excluded from the finance charge unless the charge is incidental to the lump-sum closing fee.

*4(b) Examples of Finance Charges*

*Paragraph 4(b)(2)*

Comment 4(b)(2)–1, adopted as proposed with minor revisions, clarifies that a service charge on a checking or other transaction account with a credit feature is a finance charge only if the charge exceeds the charge for a similar account without a credit feature. In the proposal, a sentence in the existing commentary regarding participation fees was inadvertently deleted; the error has been corrected.

Commenters requested that the comment clarify that charges excludable under § 226.4(c)(3)—charges imposed on an account in cases where the institution has not agreed in writing to pay overdraft items—are not required to be included as finance charges under § 226.4(b)(2); clarifying language has been added.

*4(d) Insurance*

In response to commenters, comment 4(d)–1 has been revised to clarify that for purposes of § 226.4(d), references to insurance also include debt cancellation coverage unless the context indicates otherwise.

Comment 4(d)–11 has been adopted as proposed with minor revisions for clarity. Under § 226.4(d), amounts paid for insurance or debt-cancellation coverage may be excluded from the finance charge if the creditor discloses the fee or premium for the initial term of coverage, among other conditions. Comment 4(d)–11 clarifies that the initial term is based on the period that the insurer or creditor is initially obligated to provide coverage. Comment 4(d)–12 clarifies that where the fee or premium for the coverage is assessed periodically and the consumer is under no obligation to continue making the payments, creditors have the option of providing disclosures on the basis of one year of coverage. Creditors also have this option if the initial term of the insurance is not clear.

In response to requests for guidance, comments 4(d)–4 and 4(d)–12 have been revised to address disclosures for open-end plans where the amounts of coverage and periodic premiums are based on outstanding balances. Comment 4(d)–4 clarifies that creditors providing disclosures for open-end plans on a unit-cost basis must base the cost on the initial term of coverage, unless one of the options in comment 4(d)–12 is available. Comment 4(d)–12 provides that its alternatives apply to creditors offering credit insurance or debt cancellation coverage for open-end plans or closed-end transactions. In addition, the comment clarifies that creditors with open-end plans may base their cost disclosures on periods less than one year, in some cases.

*Subpart B—Open-end Credit*

Section 226.5a—Credit and Charge Card Applications and Solicitations

*5a(b) Required Disclosures*

*5a(b)(1) Annual Percentage Rate*

Comment 5a(b)(1)–7 provides guidance on disclosing penalty rates—an increase in the rate upon a specific event such as the consumer's making a late payment or exceeding the credit limit. The proposal required card issuers to disclose the increased rate, along with the condition for increasing the rate. The comment is adopted with some modification. Commenters expressed concern that requiring penalty rates along with the condition for imposing such rates would increase the length of the disclosures required by § 226.5a. They believe the detail required by the proposal is inconsistent with the abbreviated information otherwise required to be disclosed for credit card applications and solicitations. Although information about penalty rates may add to the disclosure, the Board believes that the rate and the specified event or events that trigger a rate increase are important terms that assist consumers in comparing credit offers and deciding whether to apply for a credit card account. To address the concerns, however, the comment is modified to permit issuers using the tabular format to disclose the rate and the specified event or events that trigger an increased rate in the table, or to disclose the rate in the table along with an asterisk that refers to an explanation of the specified event or events disclosed outside the table.

Commenters also expressed concern that the comment would prevent a risk-based approach to increasing the initial rate. Creditors often increase rates to cover the expenses associated with accounts that become delinquent or otherwise do not perform in accord with the contract. Moreover, several commenters said it would be impossible to disclose the increased rate at the time of disclosure since a number of factors used to determine whether a rate will increase are based on consumer behavior, which may be reflected in a credit score.

Upon further analysis and after consideration of the comments received, a modified approach has been adopted. If the rate cannot be determined at the time of disclosure, issuers may include a description of the specified event or events that may result in an increased rate. Providing only a general description of the condition, such as stating that the rate will increase if the consumer ''fails to remain in good standing,'' is not an adequate description. In addition, a sentence has been added to clarify that the disclosure need not be as specific as that required in § 226.6(a)(2). Creditors may list some of the considerations described in the contract that are used to determine the rate without providing a detailed

16672 Federal Register / Vol. 63, No. 65 / Monday, April 6, 1998 / Rules and Regulations

explanation of all the factors that the creditor may take into consideration when increasing the rate.

*5a(b)(9) Late-Payment Fee and 5a(b)(10) Over-the-Limit Fee*

The proposal would have required that the late-payment and the over-the-limit disclosure, required under § 226.5a contain a reference to the APR disclosure required under § 226.5a(b)(1), where the APR will increase due to a late payment or exceeding the credit limit. Upon further analysis and given the tabular format requirements of § 226.5a, the link seems unnecessary. Accordingly, the proposed comments are withdrawn.

Section 226.6—Initial Disclosure Statement

*6(a) Finance Charge*

*6(a)(2) Annual Percentage Rate*

Comment 6(a)(2)–11 clarifies that if the APR will increase upon a specific event or events (such as the consumer's making a late payment or exceeding the credit limit), the creditor must include the increased rate in the disclosures required under § 226.6(a)(2) with the condition that will trigger the increase. This comment is similar to the proposal; a few modifications have been made, in response to comments, along the same lines as the modifications to comment 5a(b)(1)–7.

Section 226.7—Periodic Statement

Creditors extending open-end credit offer a variety of payment plans that permit consumers to avoid finance charges if the purchase balance is paid by a certain date. For example, under some plans finance charges are only imposed if consumers do not pay the purchase balance in full by a specified date. In others, finance charges are imposed on the purchase balance, but consumers receive rebates of any finance charges attributable to the purchase if the purchase balance is paid in full by the specified date.

Comment 7–3 gives guidance on the type of deferred payment program illustrated in the first example. In response to comments, language is added to emphasize that the comment addresses only a particular type of deferred payment feature, and is not intended to preclude creditors from offering other types. To ease compliance, three cross-references to the comment are added to provisions of § 226.7 addressing balances to which periodic rates are applied, the amount of the finance charge, and free-ride periods; a similar cross-reference is added under § 226.5(b)(2), which addresses the timing of periodic statements for open-end plans offering free-ride periods.

In response to comments, language is added providing sample descriptions for balance and finance charge amounts during the deferral period, and additional examples of how creditors may comply with the timing requirements for periodic statements for open-end plans offering free-ride periods. The comment also addresses periodic rates that may be applied to the deferred payment purchase.

Section 226.14—Determination of Annual Percentage Rate 14(c) Annual

*Percentage Rate for Periodic Statements*

Comments 14(c)–5 and 14(c)–10 are adopted substantially as proposed. Comment 14(c)–5 addresses the calculation of the APRs for multifeatured plans that charge transaction fees in addition to periodic rates. In response to requests for guidance, the comment clarifies that creditors may separately consider each feature in calculating the denominator.

Multifeatured plans are defined to include plans with features such as purchases, cash advances, or overdraft checking, or plans with groups of transactions with different pricing structures. Some creditors offer cash advances with fees that vary if the cash advance is obtained by check, at a proprietary ATM, or at a foreign financial institution. They treat each fee structure as a ''feature.'' (See comment 7–1.) Creditors may disclose APRs separately for each feature or may state a composite APR for the whole plan. Appendix F gives instructions for calculating the APR when the finance charge includes interest and transaction fees. Appendix F requires creditors to include in the denominator: (1) the balance subject to a transaction fee, plus (2) the balance subject to periodic rates, less the amount of the balance subject to a transaction charge (but not less than zero). The appendix is silent on calculating the denominator when separate features are involved.

Comment 14(c)–5 clarifies that separate features may be considered in calculating the denominator. Comments were mixed on whether ''feature'' should be defined with more precision. The comment does not attempt to define ''feature'' for purposes of the APR calculation, so long as the creditor has a reasonable basis for creating the distinction. There is no evidence at this time that further limitations on operational or pricing considerations are necessary to guard against distinctions among account services that artificially lower the APR on a consumer's periodic statement.

A commenter requested that Appendix F be amended to include an example of the guidance provided in comment 14(c)–5. Such an amendment will be considered in a future rulemaking amending Regulation Z or its appendices.

The proposal requested comment on whether a creditor should separately disclose the balances related to each feature under § 226.7(e), if features are treated separately for purposes of calculating the denominator in the APR computation. The commentary is silent on additional separate balance disclosure requirements under 7(e). Nearly all commenters addressing the issue were opposed to an additional requirement; they said it would be costly for creditors to reconfigure their periodic statements and confusing for consumers to receive periodic statements showing several balances. No separate balance requirements under § 226.7(e) relating to multifeatured plans have been added.

Comment 14(c)–10 addresses the treatment of fees imposed on transactions that occur late in a billing cycle and are impracticable to post until the following billing cycle. The comment is revised to provide broader guidance for calculating the APR when finance charges posted in the billing cycle include charges relating to activity in prior cycles, such as adjustments relating to error resolution. It is intended to provide uniformity and simplify compliance for the variety of circumstances under which adjustments may occur.

The comment differs from the proposal in two respects. Comment 14(c)–10 does not contain the proposed requirement to disclose an APR equal to the largest periodic rate that may be imposed on the account when adjustments from prior cycles would produce a negative APR in the current cycle. Commenters expressed concern that the requirement, which currently applies to creditors imposing transaction fees in addition to periodic rate finance charges, would create costly programming changes for creditors that impose finance charges solely due to periodic rates and are not required to make that calculation. Creditors must disclose on each periodic statement any periodic rate that may be applied during the billing cycle and the corresponding APR. The corresponding APR adequately informs consumers about the cost of credit under the plan in the occasional billing cycle that a consumer may receive a negative APR due to a finance charge adjustment.

The comment includes an alternative disclosure when a finance charge debited to the account in the current billing cycle relates to activity for which a finance charge was debited to the account in a previous billing cycle (for example, if the finance charge relates to an adjustment such as the resolution of a billing error dispute, or an unintentional posting error, or a payment by check that was later returned unpaid for insufficient funds or other reasons). In response to concerns by commenters, as an alternative to the general interpretation set forth in the comment, the comment permits creditors to disclose the finance charge adjustment on the periodic statement. Creditors identifying the adjustment on the periodic statement would not include the finance charge adjustment in the numerator or in balances associated with the finance charge adjustment in the denominator when calculating the annual percentage rate for the current billing cycle .

*Subpart C—Closed-end Credit*

Section 226.18—Content of Disclosures

*18(c) Itemization of Amount Financed*

Comment 18(c)–2 is revised in response to requests for guidance by creditors offering credit sales when downpayments involve a trade-in and an existing lien that exceeds the value of the trade-in. (See comment 2(a)(18)–3, where a consumer owes $10,000 on an existing automobile loan and the trade-in value of the automobile is $8,000, leaving a $2,000 deficit.)

The amount by which the lien exceeds the trade-in value would be reflected in the amount financed. (See § 226.18(b).) Assuming the cash price for the new car was $20,000, the amount financed would be $22,000 ($20,000 representing the cash price plus $2,000 representing the excess of the lien over the trade-in value financed by the creditor).

The regulation provides great flexibility for disclosing the itemization of amount financed. Comment 18(c)–2.iii. (numbered to comply with **Federal Register** publication rules) is revised to clarify that any amounts financed by the creditor and representing the excess of the lien over the trade-in value ($2,000 in this example) must appear in the itemization of the amount financed. However, creditors may also add other categories to explain, in this example, the consumer's trade-in value of $8,000, the creditor's payoff of the existing lien of $10,000, and the resulting amount of $2,000 included in the amount financed.

*18(g) Payment Schedule*

Section 226.18(g) requires creditors to disclose the timing of payments. To meet this requirement, creditors may list all of the payment due dates. Creditors also have the option of specifying the ''period of payments'' scheduled to repay the obligation. Comment 18(g)–4 clarifies the requirements for creditors choosing this option.

As a general rule, creditors that do not disclose all of the payment due dates must disclose the payment intervals, such as ''monthly'' or ''bi-weekly,'' and the calendar date that the beginning payment is due. For example, a creditor may disclose that payments are due ''monthly beginning on July 1, 1998.'' This information, when combined with the number of payments, is necessary to define the repayment period and enable a consumer to determine all of the payment due dates.

Some commenters viewed the inclusion of a beginning-payment date as a new requirement that is more appropriate for a regulatory revision than an interpretation in the commentary. The Board believes that the new comment merely interprets and clarifies the existing requirement in § 226.18(g). The staff is aware that creditors could reasonably have interpreted the statutory requirement for specifying the ''period of payments'' in different ways. Because of confusion in this area, comment 18(g)–4 has been added to explain creditors' disclosure responsibilities.

Several commenters provided examples of transactions where the beginning-payment date is unknown and difficult to determine at the time disclosures are made. For example, a consumer may become obligated on a credit contract that contemplates the delayed disbursement of funds based on a contingent event, such as the completion of home repairs. Disclosures may also accompany loan checks that are sent by mail, in which case the initial disbursement and repayment dates are solely within the consumer's control. These commenters believe that a narrative explanation of the events that will trigger the first payment due date would be more helpful to consumers than an estimated calendar date.

Comment 18(g)–4 has been revised to address these concerns. In such cases, the creditor may use an estimated beginning-payment date and label the disclosure as an estimate pursuant to § 226.17(c). Alternatively, the disclosure may refer to the occurrence of a particular event, for example, by disclosing that the beginning payment is due ''30 days after the first loan disbursement.'' This information also may be included with an estimated date to explain the basis for the creditor's estimate. See Comment 17(a)(1)–5(iii).

*Subpart E—Special Rules for Certain Home Mortgage Transactions*

Section 226.32—Requirements for Certain Closed-end Home Mortgages

*32(a) Coverage*

*32(a)(1)(ii)*

Creditors must follow the rules in § 226.32 if the total points and fees payable by the consumer at or before loan closing exceed the greater of $400 or 8 percent of the total loan amount. The Board is required to adjust the $400 amount each year. The adjusted amounts for 1997 ($424), published on December 12, 1996 (61 FR 65317), and 1998 ($435), published on February 9, 1998 (63 FR 6474), are added to comment 32(a)(1)(ii)–2.

Section 226.33—Requirements for Reverse Mortgages

*33(c) Projected Total Cost of Credit*

*33(c)(1) Costs to Consumer*

Under 226.33, the disclosed cost of a reverse mortgage transaction must contain all costs and charges paid by the consumer, including the cost of any annuity, whether the annuity purchase is mandatory or voluntary or whether it is made through the creditor or a third party. Comment 33(c)(1)–2 provides guidance for determining when an annuity is purchased as part of a reverse mortgage transaction. Some commenters requested that the Board narrow the standard for including annuity costs in the total annual loan cost rate to annuities purchased ''by or through'' the creditor, expressing their concern about accurately disclosing the impact of any annuity consumers may purchase.

The Board believes that the Congress intended a broad application of the terms ''costs and charges'' when applied to annuities. (60 FR 15468, March 24, 1995.) Thus, the comment is adopted as proposed. Creditors may rely on information provided by the consumer concerning their intent to purchase an annuity as a part of the transaction.

**List of Subjects in 12 CFR Part 226**

Advertising, Banks, banking, Consumer protection, Credit, Federal Reserve System, Mortgages, Reporting and recordkeeping requirements, Truth in lending.

For the reasons set forth in the preamble, the Board amends 12 CFR Part 226 as follows:

## PART 226—TRUTH IN LENDING (REGULATION Z)

1. The authority citation for part 226 continues to read as follows:

**Authority:** 12 U.S.C. 3806; 15 U.S.C. 1604 and 1637(c)(5).

2. In Supplement I to Part 226, under *Section 226.2—Definitions and Rules of Construction*, the following amendments are made:

a. Under *Paragraph 2(a)(2) Advertisement.*, paragraph 1. is revised;

b. Under *Paragraph 2(a)(18) Downpayment.*, a new paragraph 3. is added;

c. Under *Paragraph 2(a)(20) Open-end credit.*, paragraph 3. is revised; and

d. Under *Paragraph (2)(a)(24) Residential mortgage transaction.*, paragraph 5. is revised and a new paragraph 7. is added.

The additions and revisions read as follows:

## SUPPLEMENT I—OFFICIAL STAFF INTERPRETATIONS

* * * * *

### Subpart A—General

* * * * *

*Section 226.2—Definitions and Rules of Construction*

*2(a) Definitions.*

*(a)(2) Advertisement.*

1. *Coverage.* Only commercial messages that promote consumer credit transactions requiring disclosures are advertisements. Messages inviting, offering, or otherwise announcing generally to prospective customers the availability of credit transactions, whether in visual, oral, or print media, are covered by Regulation Z (12 CFR part 226).

i. Examples include:

A. Messages in a newspaper, magazine, leaflet, promotional flyer, or catalog.

B. Announcements on radio, television, or public address system.

C. On-line messages, such as on the Internet.

D. Direct mail literature or other printed material on any exterior or interior sign.

E. Point-of-sale displays.

F. Telephone solicitations.

G. Price tags that contain credit information.

H. Letters sent to customers as part of an organized solicitation of business.

I. Messages on checking account statements offering auto loans at a stated annual percentage rate.

J. Communications promoting a new open-end plan or closed-end transaction.

ii. The term does *not* include:

A. Direct personal contacts, such as follow-up letters, cost estimates for individual consumers, or oral or written communication relating to the negotiation of a specific transaction.

B. Informational material, for example, interest rate and loan term memos, distributed only to business entities.

C. Notices required by federal or state law, if the law mandates that specific information be displayed and only the information so mandated is included in the notice.

D. News articles the use of which is controlled by the news medium.

E. Market research or educational materials that do not solicit business.

F. Communications about an existing credit account (for example, a promotion encouraging additional or different uses of an existing credit card account).

* * * * *

*2(a)(18) Downpayment.*

* * * * *

3. *Effect of existing liens.* In a credit sale, the ''downpayment'' may only be used to reduce the cash price. For example, when the existing lien on an automobile to be traded in exceeds the value of the automobile, creditors must disclose a zero on the downpayment line rather than a negative number. To illustrate, assume a consumer owes $10,000 on an existing automobile loan and that the trade-in value of the automobile is only $8,000, leaving a $2,000 deficit. The creditor should disclose a downpayment of $0, not –$2,000.

* * * * *

*2(a)(20) Open-end credit.*

* * * * *

3. *Repeated transactions.* Under this criterion, the creditor must reasonably contemplate repeated transactions. This means that the credit plan must be usable from time to time and the creditor must legitimately expect that there will be repeat business rather than a one-time credit extension. The creditor must expect repeated dealings with consumers under the credit plan as a whole and need not believe a consumer will reuse a particular feature of the plan. The determination of whether a creditor can reasonably contemplate repeated transactions requires an objective analysis. Information that much of the creditor's customer base with accounts under the plan make repeated transactions over some period of time is relevant to the determination, particularly when the plan is opened primarily for the financing of infrequently purchased products or services. A standard based on reasonable belief by a creditor necessarily includes some margin for judgmental error. The fact that particular consumers do not return for further credit extensions does not prevent a plan from having been properly characterized as open-end. For example, if much of the customer base of a clothing store makes repeat purchases, the fact that some consumers use the plan only once would not affect the characterization of the store's plan as open-end credit. The criterion regarding repeated transactions is a question of fact to be decided in the context of the creditor's type of business and the creditor's relationship with its customers. For example:

i. It would be more reasonable for a thrift institution chartered for the benefit of its members to contemplate repeated transactions with a member than for a seller of aluminum siding to make the same assumption about its customers.

ii. It would be more reasonable for a financial institution to make advances from a line of credit for the purchase of an automobile than for an automobile dealer to sell a car under an open-end plan.

* * * * *

*2(a)(24) Residential mortgage transaction.*

* * * * *

5. *Acquisition.* i. A residential mortgage transaction finances the acquisition of a consumer's principal dwelling. The term does not include a transaction involving a consumer's principal dwelling if the consumer had previously purchased and acquired some interest to the dwelling, even though the consumer had not acquired full legal title.

ii. Examples of new transactions involving a previously acquired dwelling include the financing of a balloon payment due under a land sale contract and an extension of credit made to a joint owner of property to buy out the other joint owner's interest. In these instances, disclosures are not required under § 226.18(q) or § 226.19(a) (assumability policies and early disclosures for residential mortgage transactions). However, the rescission rules of §§ 226.15 and 226.23 do apply to these new transactions.

iii. In other cases, the disclosure and rescission rules do not apply. For example, where a buyer enters into a written agreement with the creditor holding the seller's mortgage, allowing the buyer to assume the mortgage, if the buyer had previously purchased the property and agreed with the seller to make the mortgage payments, § 226.20(b) does not apply (assumptions involving residential mortgages).

* * * * *

7. *Construction on previously acquired vacant land.* A residential mortgage transaction includes a loan to finance the construction of a consumer's principal dwelling on a vacant lot previously acquired by the consumer.

* * * * *

3. In Supplement I to Part 226, under *Section 226.4—Finance Charge*, the following amendments are made:

a. Under *Paragraph 4(a)(2).*, paragraph 2. is revised;

b. Under *Paragraph 4(b)(2).*, paragraph 1. is revised; and

c. Under *Paragraph 4(d) Insurance and debt cancellation coverage.*, paragraphs 1., 4., and 11. are revised; paragraph 12. is redesignated as paragraph 13.; and a new paragraph 12. is added.

The revisions and additions read as follows:

* * * * *

*Section 226.4—Finance Charge*

*4(a) Definition.*

* * * * *

*4(a)(2) Special rule: closing agent charges.*

* * * * *

2. *Required closing agent.* If the creditor requires the use of a closing agent, fees charged by the closing agent are included in the finance charge only if the creditor requires the particular service, requires the imposition of the charge, or retains a portion of the charge. Fees charged by a third-party closing agent may be otherwise excluded from the finance charge under § 226.4. For example, a fee that would be paid in a comparable cash transaction may be excluded under § 226.4(a). A charge for conducting or attending a closing is a finance charge and may be excluded only if the charge is included in and is incidental to a lump-sum closing fee excluded under § 226.4(c)(7).

* * * * *

*4(b) Examples of finance charges.*

* * * * *

*Paragraph 4(b)(2).*

1. *Checking account charges.* A checking or transaction account charge imposed in connection with a credit feature is a finance charge under § 226.4(b)(2) to the extent the charge exceeds the charge for a similar account without a credit feature. If a charge for an account with a credit feature does not exceed the charge for an account without a credit feature, the charge is not a finance charge under § 226.4(b)(2). To illustrate:

i. A $5 service charge is imposed on an account with an overdraft line of credit (where the institution has agreed in writing to pay an overdraft), while a $3 service charge is imposed on an account without a credit feature; the $2 difference is a finance charge. (If the difference is not related to account activity, however, it may be excludable as a participation fee. See the commentary to § 226.4(c)(4).)

ii. A $5 service charge is imposed for each item that results in an overdraft on an account with an overdraft line of credit, while a $25 service charge is imposed for paying or returning each item on a similar account without a credit feature; the $5 charge is not a finance charge.

* * * * *

*4(d) Insurance and debt cancellation coverage.*

1. *General.* Section 226.4(d) permits insurance premiums and charges and debt-cancellation charges to be excluded from the finance charge. The required disclosures must be made in writing. The rules on location of insurance and debt-cancellation disclosures for closed-end transactions are in § 226.17(a). For purposes of § 226.4(d), all references to insurance also include debt cancellation coverage unless the context indicates otherwise.

* * * * *

4. *Unit-cost disclosures.* i. *Open-end credit.* The premium or fee for insurance or debt cancellation for the initial term of coverage may be disclosed on a unit-cost basis in open-end credit transactions. The cost per unit should be based on the initial term of coverage, unless one of the options under comment 4(d)–12 is available.

ii. *Closed-end credit.* One of the transactions for which unit-cost disclosures (such as 50 cents per year for each $100 of the amount financed) may be used in place of the total insurance premium involves a particular kind of insurance plan. For example, a consumer with a current indebtedness of $8,000 is covered by a plan of credit life insurance coverage with a maximum of $10,000. The consumer requests an additional $4,000 loan to be covered by the same insurance plan. Since the $4,000 loan exceeds, in part, the maximum amount of indebtedness that can be covered by the plan, the creditor may properly give the insurance cost disclosures on the $4,000 loan on a unit-cost basis.

* * * * *

11. *Initial term.* i. The initial term of the insurance or debt cancellation coverage determines the period for which a premium amount or fee must be disclosed, unless one of the options discussed under comment 4(d)–12 is available. For purposes of § 226.4(d), the initial term is the period for which the insurer or creditor is obligated to provide coverage, even though the consumer may be allowed to cancel the coverage or coverage may end due to nonpayment before that term expires.

ii. For example:

A. The initial term of a property insurance policy on an automobile that is written for one year is one year even though premiums are paid monthly and the term of the credit transaction is four years.

B. The initial term of an insurance policy is the full term of the credit transaction if the consumer pays or finances a single premium in advance.

12. *Initial term; alternative.* i. *General.* A creditor has the option of providing cost disclosures on the basis of one year of insurance or debt cancellation coverage instead of a longer initial term (provided the premium or fee is clearly labeled as being for one year) if:

A. The initial term is indefinite or not clear; or

B. The consumer has agreed to pay a premium or fee that is assessed periodically but the consumer is under no obligation to continue the coverage after making the initial payment.

ii. *Open-end plans.* For open-end plans, a creditor also has the option of providing unit-cost disclosures on the basis of a period that is less than one year if the consumer has agreed to pay a premium or fee that is assessed periodically, for example monthly, but the consumer is under no obligation to continue the coverage.

iii. *Examples.* To illustrate:

A. A credit life insurance policy providing coverage for a 30-year mortgage loan has an initial term of 30 years even though premiums are paid monthly and the consumer is not required to continue the coverage after making the initial payment. The creditor has the option of making disclosures on the basis of coverage for one-year.

* * * * *

4. In Supplement I to Part 226, under *Section 226.5—General Disclosure Requirements,* under *Paragraph 5(b)(2)(ii)* a new paragraph 4 is added as follows:

* * * * *

**Subpart B—Open-End Credit**

* * * * *

*Section 226.5—General Disclosure Requirements*

* * * * *

*5(b) Time of disclosures.*

* * * * *

*Paragraph 5(b)(2)(ii).*

* * * * *

4. *Deferred payment transactions.* See comment 7–3(iv).

* * * * *

5. In Supplement I to Part 226, under *Section 226.5a—Credit and Charge Card Applications and Solicitations,* under *Paragraph 5a(b)(1) Annual Percentage Rate,* a new paragraph 7 is added to read as follows:

* * * * *

*Section 226.5a—Credit and Charge Card Applications and Solicitations*

* * * * *

*5a(b) Required Disclosures.*

*5a(b)(1) Annual Percentage Rate.*

* * * * *

7. *Increased penalty rates.* If the initial rate may increase upon the occurrence of one or more specific events, such as a late payment or an extension of credit that exceeds the credit limit, the card issuer must disclose in the table the initial rate and the increased penalty rate that may apply. If the penalty rate is based on an index and an increased margin, the issuer must also disclose in the table the index and the margin. The issuer must also disclose the specific event or events that may result in imposing the increased rate, such as ''22% APR, if 60 days late.'' If the penalty rate cannot be determined at the time disclosures are given, the issuer must provide an explanation of the specific event or events that may result in imposing an increased rate. In describing the specific event or events that may result in an increased rate, issuers need not be as detailed as for the disclosures required under § 226.6(a)(2). Alternatively, for issuers using a tabular format, the specific event or events may be located outside of the table if the conditions are noted with an asterisk or other means that direct the consumer to the explanation. At its option, the issuer may disclose the period for which the increased rate will remain in effect, such as ''until you make three timely payments.'' The issuer need not disclose an increased rate that is imposed when credit privileges are permanently terminated.

* * * * *

6. In Supplement I to Part 226, under *Section 226.6—Initial Disclosure Statement,* under *Paragraph 6(a)(2),* a new paragraph 11 is added to read as follows:

* * * * *

*Section 226.6—Initial Disclosure Statement*

* * * * *

*6(a) Finance charge.*

* * * * *

16676 **Federal Register** / Vol. 63, No. 65 / Monday, April 6, 1998 / Rules and Regulations

*Paragraph 6(a)(2).*

* * * * *

11. *Increased penalty rates.* If the initial rate may increase upon the occurrence of one or more specific events, such as a late payment or an extension of credit that exceeds the credit limit, the creditor must disclose the initial rate and the increased penalty rate that may apply. If the penalty rate is based on an index and an increased margin, the issuer must disclose the index and the margin. The creditor must also disclose the specific event or events that may result in the increased rate, such as ''22% APR, if 60 days late.'' If the penalty rate cannot be determined at the time disclosures are given, the creditor must provide an explanation of the specific event or events that may result in the increased rate. At the creditor's option, the creditor may disclose the period for which the increased rate will remain in effect, such as ''until you make three timely payments.'' The creditor need not disclose an increased rate that is imposed when credit privileges are permanently terminated.

* * * * *

7. In Supplement I to Part 226, under *Section 226.7—Periodic Statement*, the following amendments are made:

a. Under introductory text, a new paragraph 3 is added;

b. Under *Paragraph 7(d) Periodic rates*, a new paragraph 7 is added;

c. Under *Paragraph 7(e) Balance on which finance charge computed*, a new paragraph 10 is added;

d. Under *Paragraph 7(f) Amount of finance charge*, a new paragraph 9 is added; and

e. Under *Paragraph 7(j) Free-ride period*, a new paragraph 2 is added.

The additions read as follows:

* * * * *

*Section 226.7—Periodic Statement*

* * * * *

3. *Deferred payment transactions.* Creditors offer a variety of payment plans for purchases that permit consumers to avoid finance charges if the purchase balance is paid in full by a certain date. The following provides guidance for one type of deferred payment plan where, for example, no finance charge is imposed on a $500 purchase made in January if the $500 balance is paid by March 31.

i. *Periodic rates.* Under § 226.7(d), creditors must disclose each periodic rate that may be used to compute the finance charge. Under some plans with a deferred payment feature, if the deferred payment balance is not paid by the payment due date, finance charges attributable to periodic rates applicable to the billing cycles between the date of purchase and the payment due date (January through March in this example) may be imposed. Periodic rates that may apply to the deferred payment balance ($500 in this example) if the balance is not paid in full by the payment due date must appear on periodic statements for the billing cycles between the date of purchase and the payment due date. However, if the consumer does not pay the deferred payment balance by the due date, the creditor is not required to identify, on the periodic statement disclosing the finance charge for the deferred payment balance, periodic rates that have been disclosed in previous billing cycles between the date of purchase and the payment due date.

ii. *Balances subject to periodic rates.* Under § 226.7(e), creditors must disclose the balances subject to periodic rates during a billing cycle. The deferred payment balance ($500 in this example) is not subject to a periodic rate for billing cycles between the date of purchase and the payment due date. Periodic statements sent for those billing cycles should not include the deferred payment balance in the balance disclosed under § 226.7(e). At the creditor's option, this amount may be disclosed on periodic statements provided it is identified by a term other than the term used to identify the balance disclosed under § 226.7(e) (such as ''deferred payment balance''). During any billing cycle in which a periodic rate finance charge on the deferred payment balance is debited to the account, the balance disclosed under § 226.7(e) should include the deferred payment balance for that billing cycle.

iii. *Amount of finance charge.* Under § 226.7(f), creditors must disclose finance charges imposed during a billing cycle. For some deferred payment purchases, the creditor may impose a finance charge from the date of purchase if the deferred payment balance ($500 in this example) is not paid in full by the due date, but otherwise will not impose finance charges for billing cycles between the date of purchase and the payment due date. Periodic statements for billing cycles preceding the payment due date should not include in the finance charge disclosed under § 226.7(f) the amounts a consumer may owe if the deferred payment balance is not paid in full by the payment due date. In this example, the February periodic statement should not identify as finance charges interest attributable to the $500 January purchase. At the creditor's option, this amount may be disclosed on periodic statements provided it is identified by a term other than ''finance charge'' (such as ''contingent finance charge'' or ''deferred finance charge''). The finance charge on a deferred payment balance should be reflected on the periodic statement under § 226.7(f) for the billing cycle in which the finance charge is debited to the account.

iv. *Free-ride period.* Assuming monthly billing cycles ending at month-end and a free-ride period ending on the 25th of the following month, here are four examples illustrating how a creditor may comply with the requirement to disclose the free-ride period applicable to a deferred payment balance ($500 in this example) and with the 14-day rule for mailing or delivering periodic statements before imposing finance charges (see § 226.5):

A. The creditor could include the $500 purchase on the periodic statement reflecting account activity for February and sent on March 1 and identify March 31 as the payment due date for the $500 purchase. (The creditor could also identify March 31 as the payment due date for any other amounts that would normally be due on March 25.)

B. The creditor could include the $500 purchase on the periodic statement reflecting activity for March and sent on April 1 and identify April 25 as the payment due date for the $500 purchase, permitting the consumer to avoid finance charges if the $500 is paid in full by April 25.

C. The creditor could include the $500 purchase and its due date on each periodic statement sent during the deferred payment period (January, February, and March in this example).

D. If the due date for the deferred payment balance is March 7 (instead of March 31), the creditor could include the $500 purchase and its due date on the periodic statement reflecting activity for January and sent on February 1, the most recent statement sent at least 14 days prior to the due date.

* * * * *

*7(d) Periodic rates.*

* * * * *

7. *Deferred payment transactions.* See comment 7–3(i).

*7(e) Balance on which finance charge computed.*

* * * * *

10. *Deferred payment transactions.* See comment 7–3(ii).

*7(f) Amount of finance charge.*

* * * * *

9. *Deferred payment transactions.* See comment 7–3(iii).

* * * * *

*7(j) Free-ride period.*

* * * * *

2. *Deferred payment transactions.* See comment 7–3(iv).

* * * * *

8. In Supplement I to Part 226, under *Section 226.14—Determination of Annual Percentage Rate,* under *Paragraph 14(c) Annual percentage rate for periodic statements.*, paragraph 5. and paragraph 10. are revised to read as follows:

* * * * *

*Section 226.14—Determination of Annual Percentage Rate*

* * * * *

*14(c) Annual percentage rate for periodic statements.*

* * * * *

5. *Transaction charges.* i. Section 226.14(c)(3) transaction charges include, for example:

A. A loan fee of $10 imposed on a particular advance.

B. A charge of 3% of the amount of each transaction.

ii. The reference to avoiding duplication in the computation requires that the amounts of transactions on which transaction charges were imposed not be included both in the amount of total balances and in the ''other amounts on which a finance charge was imposed'' figure. In a multifeatured plan, creditors may consider each bona fide feature separately in the calculation of the denominator. A creditor has considerable flexibility in defining features for open-end plans, as long as the creditor has a reasonable

basis for the distinctions. For further explanation and examples of how to determine the components of this formula, see appendix F.

* * * * *

10. *Prior-cycle adjustments.* i. The annual percentage rate reflects the finance charges imposed during the billing cycle. However, finance charges imposed during the billing cycle may relate to activity in a prior cycle. Examples of circumstances when this may occur are:

A. A cash advance occurs on the last day of a billing cycle on an account that uses the transaction date to figure finance charges, and it is impracticable to post the transaction until the following cycle.

B. An adjustment to the finance charge is made following the resolution of a billing error dispute.

C. A consumer fails to pay the purchase balance under a deferred payment feature by the payment due date, and finance charges are imposed from the date of purchase.

ii. Finance charges relating to activity in prior cycles should be reflected on the periodic statement as follows:

A. If a finance charge imposed in the current billing cycle is attributable to periodic rates applicable to prior billing cycles (such as when a deferred payment balance was not paid in full by the payment due date and finance charges from the date of purchase are now being debited to the account, or when a cash advance occurs on the last day of a billing cycle on an account that uses the transaction date to figure finance charges and it is impracticable to post the transaction until the following cycle), and the creditor uses the quotient method to calculate the annual percentage rate, the numerator would include the amount of any transaction charges plus any other finance charges posted during the billing cycle. At the creditor's option, balances relating to the finance charge adjustment may be included in the denominator if permitted by the legal obligation, if it was impracticable to post the transaction in the previous cycle because of timing, or if the adjustment is covered by comment 14(c)10.11.B.

B. If a finance charge debited to the account relates to activity for which a finance charge was debited to the account in a previous billing cycle, for example, if the finance charge relates to an adjustment such as the resolution of a billing error dispute, or an unintentional posting error, or a payment by check that was later returned unpaid for insufficient funds or other reasons, the creditor shall at its option:

1. Calculate the annual percentage rate in accord with comment 14(c)10.11.A, or

2. Disclose the finance charge adjustment on the periodic statement and calculate the annual percentage rate for the current billing cycle without including the finance charge adjustment in the numerator and balances associated with the finance charge adjustment in the denominator.

* * * * *

9. In Supplement I to Part 226, under *Section 226.18—Content of Disclosures*, the following amendments are made:

a. Under *Paragraph 18(c) Itemization of amount financed.*, paragraph 2. is revised; and

b. Under *Paragraph 18(g) Payment schedule.*, the 18(g) heading is revised, and a new paragraph 4. is added.

The revisions and addition read as follows:

* * * * *

## Subpart C–Closed-End Credit

* * * * *

*Section 226.18—Content of Disclosures*

* * * * *

*18(c) Itemization of amount financed.*

* * * * *

2. *Additional information.* Section 226.18(c) establishes only a minimum standard for the material to be included in the itemization of the amount financed. Creditors have considerable flexibility in revising or supplementing the information listed in § 226.18(c) and shown in model form H–3, although no changes are required. The creditor may, for example, do one or more of the following:

i. Include amounts that reflect payments not part of the amount financed. For example, escrow items and certain insurance premiums may be included, as discussed in the commentary to § 226.18(g).

ii. Organize the categories in any order. For example, the creditor may rearrange the terms in a mathematical progression that depicts the arithmetic relationship of the terms.

iii. Add categories. For example, in a credit sale, the creditor may include the cash price and the downpayment. If the credit sale involves a trade-in of the consumer's car and an existing lien on that car exceeds the value of the trade-in amount, the creditor may disclose the consumer's trade-in value, the creditor's payoff of the existing lien, and the resulting additional amount financed.

iv. Further itemize each category. For example, the amount paid directly to the consumer may be subdivided into the amount given by check and the amount credited to the consumer's savings account.

v. Label categories with different language from that shown in § 226.18(c). For example, an amount paid on the consumer's account may be revised to specifically identify the account as ''your auto loan with us.''

vi. Delete, leave blank, mark ''N/A'' or otherwise not inapplicable categories in the itemization. For example, in a credit sale with no prepaid finance charges or amounts paid to others, the amount financed may consist of only the cash price less downpayment. In this case, the itemization may be composed of only a single category and all other categories may be eliminated.

* * * * *

*18(g) Payment schedule.*

* * * * *

4. *Timing of payments.* i. *General rule.* Section 226.18(g) requires creditors to disclose the timing of payments. To meet this requirement, creditors may list all of the payment due dates. They also have the option of specifying the ''period of payments'' scheduled to repay the obligation. As a general rule, creditors that choose this option must disclose the payment intervals or frequency, such as ''monthly''or ''bi-weekly,'' and the calendar date that the beginning payment is due. For example, a creditor may disclose that payments are due ''monthly beginning on July 1, 1998.'' This information, when combined with the number of payments, is necessary to define the repayment period and enable a consumer to determine all of the payment due dates.

ii. *Exception.* In a limited number of circumstances, the beginning-payment date is unknown and difficult to determine at the time disclosures are made. For example, a consumer may become obligated on a credit contract that contemplates the delayed disbursement of funds based on a contingent event, such as the completion of home repairs. Disclosures may also accompany loan checks that are sent by mail, in which case the initial disbursement and repayment dates are solely within the consumer's control. In such cases, if the beginning-payment date is unknown the creditor may use an estimated date and label the disclosure as an estimate pursuant to § 226.17(c). Alternatively, the disclosure may refer to the occurrence of a particular event, for example, by disclosing that the beginning payment is due ''30 days after the first loan disbursement.'' This information also may be included with an estimated date to explain the basis for the creditor's estimate. See Comment 17(a)(1)–5(iii).

* * * * *

10. In Supplement I to Part 226, under *Section 226.32—Requirements for Certain Closed-End Home Mortgages*, under *Paragraph 32(a)(1)(ii)*, paragraph 2. is revised to read as follows:

* * * * *

## Subpart E—Special Rules for Certain Home Mortgage Transactions

* * * * *

*Section 226.32—Requirements for Certain Closed-End Home Mortgages*

*32(a) Coverage.*

* * * * *

*Paragraph 32(a)(1)(ii).*

* * * * *

2. *Annual adjustment of $400 amount.* A mortgage loan is covered by § 226.32 if the total points and fees payable by the consumer at or before loan consummation exceed the greater of $400 or 8 percent of the total loan amount. The $400 figure is adjusted annually by the Board; the adjusted figure becomes effective on January 1 of the following year. The Board will publish adjustments after the June figures become available each year. The adjustment for the upcoming year will be included in any proposed commentary published in the fall, and incorporated into the commentary the following spring. The adjusted figures are:

i. For 1996, $412, reflecting a 3.00 percent increase in the CPI–U from June 1994 to June 1995, rounded to the nearest whole dollar.

ii. For 1997, $424, reflecting a 2.9 percent increase in the CPI–U from June 1995 to June 1996, rounded to the nearest whole dollar.

16678 **Federal Register** / Vol. 63, No. 65 / Monday, April 6, 1998 / Rules and Regulations

iii. For 1998, $435, reflecting a 2.5 percent increase in the CPI–U from June 1996 to June 1997, rounded to the nearest whole dollar.

* * * * *

11. In Supplement I to Part 226, under *Section 226.33—Requirements for Reverse Mortgages*, under *Paragraph 33(c)(1) Costs to consumer*, in paragraph 2., a new sentence is added at the end of the paragraph to read as follows:

* * * * *

*Section 226.33—Requirements for Reverse Mortgages*

* * * * *

*33(c) Projected total cost of credit.*

*Paragraph 33(c)(1) Costs to consumer.*

* * * * *

2. *Annuity costs.* * * * For example, this includes the costs of an annuity that a creditor offers, arranges, assists the consumer in purchasing, or that the creditor is aware the consumer is purchasing as a part of the transaction.

* * * * *

By order of the Board of Governors of the Federal Reserve System, acting through the Secretary of the Board under delegated authority, March 31, 1998.

**William W. Wiles,**

*Secretary of the Board.*

[FR Doc. 98–8829 Filed 4–3–98; 8:45 am]

BILLING CODE 6210–01–P

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 39

**[Docket No. 97–CE–119–AD; Amendment 39–10438; AD 98–07–18]**

**RIN 2120–AA64**

## Airworthiness Directives; Pilatus Aircraft Ltd. Models PC–12 and PC–12/45 Airplanes

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** Final rule.

**SUMMARY:** This amendment adopts a new airworthiness directive (AD) that applies to certain Pilatus Aircraft Ltd. (Pilatus) Models PC–12 and PC–12/45 airplanes. This AD requires replacing certain propeller de-icing controllers with ones that are not susceptible to electromagnetic interference (EMI). This AD is the result of mandatory continuing airworthiness information (MCAI) issued by the airworthiness authority for Switzerland. The actions specified by this AD are intended to prevent improper operation of the propeller de-icing controller caused by EMI, which could result in ice build-up on the propeller with possible airplane controllability problems.

**DATES:** Effective April 28, 1998.

The incorporation by reference of certain publications listed in the regulations is approved by the Director of the Federal Register as of April 28, 1998.

**ADDRESSES:** Service information that applies to this AD may be obtained from Pilatus Aircraft Ltd., Marketing Support Department, CH–6370 Stans, Switzerland; telephone: +41 41–6196 233; facsimile: +41 41–6103 351. This information may also be examined at the Federal Aviation Administration (FAA), Central Region, Office of the Regional Counsel, Attention: Rules Docket No. 97–CE–119–AD, Room 1558, 601 E. 12th Street, Kansas City, Missouri 64106; or at the Office of the Federal Register, 800 North Capitol Street, NW, suite 700, Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Roman T. Gabrys, Aerospace Engineer, Small Airplane Directorate, Airplane Certification Service, FAA, 1201 Walnut, suite 900, Kansas City, Missouri 64106; telephone: (816) 426–6932; facsimile: (816) 426–2169.

**SUPPLEMENTARY INFORMATION:**

### Events Leading to the Issuance of This AD

A proposal to amend part 39 of the Federal Aviation Regulations (14 CFR part 39) to include an AD that would apply to certain Pilatus Models PC–12 and PC–12/45 airplanes was published in the **Federal Register** as a notice of proposed rulemaking (NPRM) on January 22, 1998 (63 FR 3276). The NPRM proposed to require replacing certain propeller de-icing controllers with ones that are not susceptible to electromagnetic interference (EMI). Accomplishment of the proposed action as specified in the NPRM would be in accordance with Pilatus Service Bulletin No. 30–002, dated August 19, 1996.

The NPRM was the result of mandatory continuing airworthiness information (MCAI) issued by the airworthiness authority for Switzerland.

Interested persons have been afforded an opportunity to participate in the making of this amendment. No comments were received on the proposed rule or the FAA's determination of the cost to the public.

### The FAA's Determination

After careful review of all available information related to the subject presented above, the FAA has determined that air safety and the public interest require the adoption of the rule as proposed except for minor editorial corrections. The FAA has determined that these minor corrections will not change the meaning of the AD and will not add any additional burden upon the public than was already proposed.

### Compliance Time of This AD

While the condition described in this AD is unsafe while the airplane is in operation, it is not a direct result of airplane operation. For example, the unsafe condition exists or could develop on an airplane with 500 hours time-in-service (TIS) the same as one with 10 hours TIS. For this reason, the FAA has determined that a compliance based on calendar time should be utilized in this AD in order to assure that the unsafe condition is addressed on all airplanes in a reasonable time period.

### Cost Impact

The FAA estimates that 53 airplanes in the U.S. registry will be affected by this AD, that it will take approximately 2 workhours per airplane to accomplish this replacement, and that the average labor rate is approximately $60 an hour. Parts will be provided by the manufacturer free of charge. Based on these figures, the total cost impact of this AD on U.S. operators is estimated to be $6,360, or $120 per airplane.

### Regulatory Impact

The regulations adopted herein will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 12612, it is determined that this final rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

For the reasons discussed above, I certify that this action (1) is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034, February 26, 1979); and (3) will not have a significant economic impact, positive or negative, on a substantial number of small entities under the criteria of the Regulatory Flexibility Act. A copy of the final evaluation prepared for this action is contained in the Rules Docket. A copy of it may be obtained by contacting the Rules Docket at the location provided under the caption **ADDRESSES**.

### List of Subjects in 14 CFR Part 39

Air transportation, Aircraft, Aviation safety, Incorporation by reference, Safety.