UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NICHOLAS FITTS and
LORRAINE FITTS,
*Plaintiffs,*

vs. C.A. No. 07-147ML

KING RICHARD'S AUTO CENTER, INC.,
d/b/a East Providence Mitsubishi,
*Defendant.*

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Defendant, in the above-referenced matter, and hereby moves this Court for an Order of summary judgment in its favor. As grounds, Defendant relies on its Memorandum of Law filed contemporaneously herewith.

Defendant,
By its attorney

*/s/ Michael A. DeSisto*

Michael A. DeSisto (#2444)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
(401) 272-4442
(401) 272-9937 fax
michael@desistolaw.com

CERTIFICATION

I hereby certify that the within document has been electronically filed with the Court on December 19, 2007, that it is available for viewing and downloading from the ECF system, and that counsel of record listed below will receive notice via the ECF system:

John T. Longo, Esq.
jtlongo@yahoo.com

*/s/ Michael A. DeSisto*

Michael A. DeSisto

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NICHOLAS FITTS and<br>LORRAINE FITTS,<br>*Plaintiffs,*<br><br>vs.<br><br>KING RICHARD'S AUTO CENTER, INC.,<br>d/b/a East Providence Mitsubishi,<br>*Defendant.* | C.A. No. 07-147ML |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. Introduction

This case focuses on the very dry and technical world of the Truth in Lending Act ("TILA") and its related regulations and staff interpretations. Plaintiffs contend a TILA violation in their purchase of a motor vehicle from Defendant. However, the complaints raised by Plaintiffs were recently addressed and rejected by another Federal District Court. Defendant, therefore, moves this Court for an entry of summary judgment in its favor.

## II. Facts

On or about October 3, 2006, Plaintiff, Nicholas Fitts, and his mother, Lorraine Fitts, purchased a used motor vehicle – a 2000 Mercedes Kompressor - from Defendant. The purchase included the trade-in of Plaintiffs' 2001 Ford Taurus. The Taurus was encumbered by a motor vehicle loan. The amount of the loan exceeded the trade-in value of the Taurus thereby creating negative equity, so-called, in Plaintiffs' vehicle. Defendant calculated this negative equity at $4,500.00. *See Negative Equity Disclosure attached as Exhibit A*.

Plaintiffs elected to finance the purchase of the Mercedes. They signed a Retail Installment – Sale Agreement and Security Agreement ("RISA"). *The Retail Installment – Sale Agreement and Security Agreement is attached as Exhibit B*. Plaintiffs now contend that certain disclosures in the RISA violate the requirements of the Truth in Lending Act, 15 U.S.C. §§ 1601, et seq. ("TILA"). However, an examination of this transaction reveals that the opposite is true – that the disclosures complied with the TILA and existing case law.

## III. Standard of Review – Motion for Summary Judgment

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the [Civil] Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986)*. Summary judgment is lawful and proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In addition, "[s]ummary judgment is appropriate against a party who, after a sufficient time for discovery, 'fails to make a showing sufficient to establish the existence of a single element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Torraco v. Maloney, 923 F.2d 231, 232 (1st Cir. 1991)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986))*.

According to *Fed. R. 56(e)*:

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary

> judgment, if appropriate, shall be entered against the adverse party. *(Emphasis added)*.

Based upon the foregoing, the United States Supreme Court observed that the above two sentences of Rule 56(e) were added "to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings." *Celotex Corp, 477 U.S. at 325, 106 S.Ct. at 2554*. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 2514 (1986).*

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id. at 249, 106 S.Ct. at 2511 (emphasis added).* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id. at 249-50, 106 S.Ct. at 2511 (emphasis added)*. As the Court recognized:

> [n]or are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether where is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed. *Id. at 251, 106 S.Ct at 2511 (emphases in original).*

Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id. at 252, 106 S.Ct. at 2512 (emphasis added)*.

## IV. Argument

Plaintiffs contend that Defendant violated the TILA in the following two ways:

1. The RISA failed to disclose the negative equity in the Taurus as required by Regulation Z. *Plaintiffs' Complaint, paragraph 22(a)*.

2. The RISA failed to disclose the true cost of the credit being extended to Plaintiff because the disclosed sales price for the Mercedes was higher than that which a cash buyer would have paid. *Id. at paragraph 22(b)*.

Coincidentally, these two very same issues were addressed - and Plaintiffs' contentions were rejected - in *Slover-Becker v. Pitre Chrysler Plymouth Jeep of Scottsdale, Inc., 409 F.Supp.2d 1158d. (D.Ariz 2005)* In *Slover-Becker*, the plaintiff purchased a used 2000 Mercedes-Bentz ML320 from the Pitre Chrysler auto dealership. Similar to the instant case:

1. The purchase involved the trade-in of the Slover-Becker's motor vehicle, a Jeep Cherokee;

2. The Jeep was encumbered by a motor vehicle loan, which exceeded its trade-in value, thereby creating negative equity in the Jeep;

3. Slover-Becker elected to finance the purchase of the Mercedes and signed a Retail Installment Sales Contract; and

4. After the purchase, Slover-Becker alleged a TILA violation complaining,

a) that the value of the Jeep trade in "was overstated by $10,800 [the amount of the negative equity], which was 'rolled into' and increased the cash price of the Mercedes" and,

b) "in so doing, Pitre failed to disclose that it had rolled the $10,800 negative equity from the Jeep Cherokee into the amount financed." *Id. at 1159*.

The *Slover-Becker* court framed the issue this way: "does the Truth in Lending Act ('TILA') and its implementing regulation, 'Regulation Z' promulgated by the Federal Reserve Board, require the amount of the 'negative equity' in a vehicle traded in on another vehicle to be clearly and separately disclosed?" *Id. at 1159-1160*. The court answered that question in the

negative: the TILA, and its implementing regulations, do not require negative equity to be separately disclosed. *Id. at 1162*.

In its ruling, the *Slover-Becker* court referenced and analyzed the TILA and its various implementing regulations and staff interpretations. Plaintiffs cite these very same regulations and staff interpretations in their Complaint. However, as the *Slover-Becker* case teaches, these regulations offer no support to Plaintiffs' claim that negative equity must be separately disclosed on the RISA. Plaintiffs cite *63 Fed.Reg. 1669* to support their contention that negative equity must be separately disclosed on the RISA. *See Plaintiffs' Complaint, paragraph 22(a)*. But that regulation actually supports the opposite proposition because it states:

> Comment 18(c)-2 is revised in response to requests for guidance by creditors offering credit sales when down payments involve a trade-in and an existing lien that exceeds the value of the trade-in. (See comment 2(a)(18)-3, where a consumer owes $10,000 on an existing automobile loan and the trade-in value of the automobile is $8,000, leave a $2,000 deficit.)
>
> The amount by which the lien exceeds the trade-in value would be reflected in the amount financed. (See § 226.18(b).) Assuming the case price for the new car was $20,000, the amount financed would be $22,000 ($20,000 representing the cash price plus $2,000 representing the excess of the lien over the trade-in value financed by the creditor).

*63 FR 16669, Section 226.18-Contents of Disclosures, 18(c) Itemization of Amount Financed. A copy is attached as Exhibit C.*

This regulation also refutes Plaintiffs' second claim that the sales price for the Mercedes was improperly disclosed on the RISA because it was higher than what a cash buyer would have paid. *Plaintiffs' Complaint, paragraph 22(b)*. The regulation instructs Defendant to do what it did in this case, namely, to increase the sale price on the RISA. As the *Slover-Becker* court stated:

> "The increase in the sales price was not a product of the fact that Becker was buying the Mercedes on credit, i.e., she was being charged more for buying on credit, it was the

> result of negative equity in the Jeep Cherokee. * * * The cash price was clearly inflated; however, as noted above, the Staff Interpretation permits a creditor to include charges that are equally imposed in cash and credit transactions to be included in the cash price."

*Slover-Becker, 409 F.Supp.2d at 1163.*

Defendant, in the instant case, followed the TILA in not separately disclosing the negative equity and increasing the sale price of vehicle on the RISA.[1]

**V. Conclusion**

For the reasons cited herein, as well as those that may be raised at hearing, Defendant respectfully requests that summary judgment enter in its favor on Plaintiff's Complaint.

Defendant,
By its attorney

*/s/ Michael A. DeSisto*

Michael A. DeSisto (#2444)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
(401) 272-4442
(401) 272-9937 fax
michael@desistolaw.com

[1] In their Complaint, Plaintiffs state that the RISA lists a Net Trade-in Allowance Downpayment of $353.28. While true, this fact does nothing to advance their claims that the negative equity must be separately disclosed on the RISA or that the sale price was higher than a cash buyer would have paid.

CERTIFICATION

I hereby certify that the within document has been electronically filed with the Court on December 19, 2007, that it is available for viewing and downloading from the ECF system, and that counsel of record listed below will receive notice via the ECF system:

John T. Longo, Esq.
jtlongo@yahoo.com

*/s/ Michael A. DeSisto*

Michael A. DeSisto

# EXHIBIT A

**Negative Equity Disclosure:**

Occasionally, when an existing trade-in Lien Payoff exceeds Actual Cash Value of a trade-in, it may becomes necessary to raise the selling price and trade-in allowance equal amounts to demonstrate a trade-in allowance in excess of Actual Cash Value to eliminate "Negative Equity" on a finance contract. Other times, due to negotiation, trade-in values may simply not be indicative of the Actual Cash Value against selling prices.

Trade-In Over Allowance in excess of Actual Cash Value : $ 4500.00

**Fee Disclosure:**

| | |
|---|---|
| ☐ Temporary Plate | $20.00 |
| ☐ Overnight Trade-in Lien Payoff | $22.00 |
| ☒ Estimated State Registration | $ 65.00 |
| ☐ Massachusetts Inspection Sticker | $29.00 |
| N/A ☐ Lost Title/Duplicate Title Fee | $25.00 |
| ☐ Title Prep Fee | $20.00 |
| ☐ Doc Fee | $75.00 |
| Total Fees | $ 189.00 |

L. Lorraine Fitts 9/30/06

Purchaser Date

[signature] 9/30/06

Manager Date

Co-Purchaser Date

# EXHIBIT B

**Greenwood CREDIT UNION**

RETAIL INSTALLMENT - SALE AGREEMENT AND SECURITY AGREEMENT
For indirect-car loans written in Rhode Island
Nonnegotiable consumer note (R.I. Gen. Laws 6-27-5)

Signed at EAST PROVIDENCE, RI on SEPTEMBER 30, 20 06 between the undersigned Seller ("us," "we" or "our"), and Buyer(s) ("you" or "your").

We, the undersigned Seller, sell and you, the undersigned Buyer(s), buy the motor vehicle described below, together with all its equipment and accessories, on the terms stated on the front and back of this Agreement. You, jointly and severally if more than one, promise to pay us at the credit union to whom we assign this Agreement (the "Credit Union") the Amount Financed stated below together with interest upon the balance of the Amount Financed which may be outstanding from time to time at the Annual Percentage Rate stated below in the monthly installments stated below until paid in full. All payments will be applied first to interest accrued to the date upon which such payments are made, second to late fees, and the remainder to the principal outstanding.

To secure payment and performance of your obligations under this Agreement, you grant us a security interest in the motor vehicle together with all accessions and other additions added to the motor vehicle within ten (10) days of this Agreement and their proceeds, including insurance proceeds (all of which we refer to as "Motor Vehicle"). You agree that if the Credit Union becomes the holder of this Agreement, it will have the right of setoff, which is its right to transfer any of your funds or shares held by it in order to reduce or extinguish this or any other of your indebtedness to it, as permitted by law.

You agree that you will pay all costs of collection, including reasonable attorney's fees.

| NEW | USED | MODEL YEAR | MAKE AND MODEL | BODY TYPE | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|---|---|---|
| | X | 2002 | MERCEDES C230 | 2 DOOR COUPE | WDBRN47J02A197185 |

EQUIPPED WITH ITEMS CHECKED: X RADIO; STEREO; AUTO. TRANS.; STD. TRANS.; POWER STEERING; POWER BRAKES; POWER WINDOWS; POWER SEATS; AIR COND.; WHEEL COVERS; TINTED GLASS; VINYL ROOF/TRIM; UNDER COATING

DESCRIPTION OF SPECIAL EQUIPMENT

Unless checked here ☐, the Motor Vehicle is purchased for personal, family or household purposes

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled | Total Sale Price<br>The total cost of your purchase on credit, including your down payment of $ 353.28 |
|---|---|---|---|---|
| 12.39 % | $ 9287.72 | $ 21619.72 | $ 30907.44 | $ 31260.72 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due |
|---|---|---|
| 72 | $ 429.27 | On the 14th day of each month, beginning on 11/14/2006 |
| | $ N/A | |

**Security:** You are giving a security interest in the Motor Vehicle being purchased.
**Prepayment:** If you pay off early, you will not have to pay a penalty.
**Late Fee:** If any payment is received more than ten (10) days after it is due, you will be charged five percent (5%) of the payment amount.
**Other Terms:** Please read this Agreement, including the reverse side, for additional information on security interests, nonpayment, default, and our right to require repayment in full before the scheduled maturity date.

**ITEMIZATION OF AMOUNT FINANCED**

1. Cash Price (including any accessories and services) .......... $ 19300.00 (1)
2. Total Downpayment = Net Trade-in $ 353.28 + Cash Downpayment $ N/A
   Your Trade-in is a 2001 FORD TAURUS (Year Make Model) .......... $ 353.28 (2)
3. Unpaid Balance of Cash Price (1 minus 2) .......... $ 18946.72 (3)
4. Amounts Paid to Others on Your Behalf (Other Charges).
   A. Cost of Optional Credit Insurance for the Term of this Contract Paid to:
      (Name of Insurance Company) N/A
      Credit Life Ins. $ N/A Disability, Accident & Health Ins. $ N/A $ N/A
   B. Cost of Optional Mechanical Repair Insurance Covering Certain Mechanical Repairs Paid to:
      (Name of Insurance Company) $ 1599.00
   C. Cost of Single Interest Insurance for the term of this agreement .......... $ 60.00
   D. Sales Taxes Paid to Government Agencies .......... $ 465.00
   E. Certificate of Title Fees Paid to Government Agencies .......... $ 114.00
   F. Other Charges (Seller must identify who will receive payment and describe purpose)
      to GREENWOOD CREDIT UNION for SHARE ACCOUNT DEPOSIT $ 5.00
   G. Other Charges (Seller must identify who will receive payment and describe purpose)
      to EAST PROVIDENCE MITSUBISHI for DOC FEE $ 75.00
   H. Other Charges (Seller must identify who will receive payment and describe purpose)
      to for GAP INSURANCE $ 355.00
   Total Amounts Paid to Others on Your Behalf (Other Charges) .......... $ 2673.00 (4)
5. Amount Financed (3 + 4) .......... $ 21619.72 (5)

**Insurance: You cannot be denied credit simply because you choose not to buy credit insurance. Credit-life insurance and credit-accident and -health insurance are not required to obtain credit. Insurance will not be provided unless you sign and agree to pay the additional charge. Please see #4A above for the cost of insurance.**

Buyer wants single credit-life insurance ____ Signature

Buyers want joint credit-life insurance ____ Buyer's Signature

Buyer wants credit-accident and -health insurance ____ Signature

Co-Buyer's Signature

You may obtain property insurance, including required vendor's single-interest insurance, from anyone you want that is acceptable to us. If you purchase the vendor's single-interest insurance from us, the cost is stated abovein #4C.
LIABILITY-INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED.
You agree that the Motor Vehicle will be kept (principally garaged) at the address of the Buyer below unless a different address is filled in as follows:

Number and street ____ City or town ____ State

**NOTICE TO THE BUYER: 1. Do not sign this contract if any of the spaces intended for the agreed terms to the extent of the then-available information are left blank. 2. You are entitled to an exact copy of the contract you have signed. 3. Under the law, you have the following rights, among others: (a) to pay off in advance the full amount due and to obtain a partial refund of the finance charge; (b) to redeem the property repossessed for default; and (c) to require, under certain conditions, a resale of the property if repossessed.**

You acknowledge that you have received an exact copy of this Agreement signed by us and completely filled in where applicable before you signed this Agreement. Signed and sealed as of the above date.

BUYER (Please print) LORRAINE T FITTS
Address 27 EAST ST
WHITINSVILLE MA 01588
Signature X [signature]

SELLER EAST PROVIDENCE MITSUBISHI
By (please print)
Address 801-803 TAUNTON AVE
EAST PROVIDENCE RI 02914
Signature [signature]

CO-BUYER (Please print) NICHOLAS FITTS
Address 27 EAST ST
WHITINSVILLE MA 01588
Signature X [signature]

THE TERMS OF THIS AGREEMENT ARE CONTAINED ON BOTH SIDES OF THIS PAGE
White - Credit Union Yellow - Buyer Pink - Dealer

25-04-3P

# EXHIBIT C

guidance is provided in a revision to comment § 226.18(c)-2.

63 FR 16669, 16670

Section 226.18-Content of Disclosures

18(c) Itemization of Amount Financed

Comment 18(c)-2 is revised in response to requests for guidance by creditors offering credit sales when downpayments involve a trade-in and an existing lien that exceeds the value of the trade-in. (See comment 2(a)(18)-3, where a consumer owes $ 10,000 on an existing automobile loan and the trade-in value of the automobile is $ 8,000, leaving a $ 2,000 deficit.)

The amount by which the lien exceeds the trade-in value would be reflected in the amount financed. (See § 226.18(b).) Assuming the cash price for the new car was $ 20,000, the amount financed would be $ 22,000 ($ 20,000 representing the cash price plus $ 2,000 representing the excess of the lien over the trade-in value financed by the creditor).

The regulation provides great flexibility for disclosing the itemization of amount financed. Comment 18(c)-2.iii. (numbered to comply with Federal Register publication rules) is revised to clarify that any amounts financed by the creditor and representing the excess of the lien over the trade-in value ($ 2,000 in this example) must appear in the itemization of the amount financed. However, creditors may also add other categories to explain, in this example, the consumer's trade-in value of $ 8,000, the creditor's payoff of the existing lien of $ 10,000, and the resulting amount of $ 2,000 included in the amount financed.

63 FR 16669, 16673

Practitioner's Toolbox

History

Interpretive Notes and Decisions

History; Ancillary Laws and Directives

Resources & Practice Tools