UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

NICHOLAS FITTS and
LORRAINE FITTS,

                Plaintiffs,

                                              C.A. No. 07-147ML

      v.

KING RICHARD'S AUTO
CENTER, INC., d/b/a EAST
PROVIDENCE MITSUBISHI,

                Defendant.

## MEMORANDUM AND ORDER

In this action, Plaintiffs, Nicolas and Lorraine Fitts, seek money damages from

Defendant, King Richard's Auto Center, Inc., d/b/a East Providence Mitsubishi, ("EPM" or

"Defendant"), for alleged violations of the Truth in Lending Act, ("TILA"), 15 U.S.C. § 1601 et.

seq.  On December 5, 2008, the Court held a bench trial.  For the reasons set forth below,

judgment shall enter in favor of Defendant.

## I.  Facts

Plaintiff, Nicolas Fitts ("Mr. Fitts") is a resident of Whitinsville, Massachusetts.

Defendant is an automobile dealership located in East Providence, Rhode Island.  In September

2006 Mr. Fitts visited EPM in search of a vehicle with better gas mileage than the vehicle he

owned at that time, a 2001 Ford Taurus.  Fitts traded in the 2001 Taurus and purchased a 2002

Ford Focus.

About 1 week after the purchase, a problem arose with the Focus and Mr. Fitts and his

1

mother, Plaintiff, Lorraine Fitts ("Ms. Fitts"), returned to EPM.  Upon Mr. Fitts' return, the

manager of EPM asked Mr. Fitts whether he "wanted to drive a Mercedes . . . [for] the same

payments and the same price" as the Focus.  December 5, 2008, Transcript at 12 ("Transcript").

Mr. Fitts then test drove a 2002 Mercedes Kompressor and agreed to purchase the vehicle.

Subsequently, Mr. Fitts and Ms. Fitts signed "some paperwork" with a sales representative and

then met with a financing representative of EPM.  Mr. Fitts testified that, at the time he initially

met with the financing representative, he had not yet agreed on a price for the Mercedes.  Mr.

Fitts stated that the individual he believed to be the manager of EPM informed him that the

Mercedes was "going to be the same payments and the same price [as he had paid for the Focus.]

It was going to be a straight-up trade. . . ."  Id. at 15.  Although Mr Fitts understood that he would

be trading in the Taurus as part of the purchase of the Mercedes, Plaintiffs testified that there was

no discussion about the trade-in value of the Taurus.

Upon meeting with the financing representative, Mr. Fitts learned that the monthly

payment on the Mercedes would be $429, approximately $69 more than the monthly payment on

the Focus.  In spite of this difference, however, Ms. Fitts signed the retail installment sales

agreement as "BUYER" and Mr. Fitts signed it as "CO BUYER."  Exhibit 1.  Mr. Fitts testified

that he could not remember the purchase price of the Focus or the Mercedes but after he spoke to

the financing representative he understood that the monthly payment on the Mercedes was $429,

and "acceptable," and that the interest rate for the credit being extended to him was 12.39%.

Transcript at 27.

Plaintiffs received a copy of the retail installment sales agreement ("RISA") which listed

the cash price of the Mercedes as $19,300.  The pertinent section of the RISA appears below:

2

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled | Total Sale Price The total cost of your purchase on credit, including your down payment of $ ___ 353.28 |
|---|---|---|---|---|
| 12.39 % | $ 9297.72 | $ 21619.72 | $ 30907.44 | $ 31260.72 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are due |
|---|---|---|
| 72 | $ 429.27 | On the ___ 14th day of each month, beginning on ___ 11/14/2006 |
| | $ N/A | |

Security: You are giving a security interest in the Motor Vehicle being purchased.
Prepayment: If you pay off early, you will not have to pay a penalty.
Late Fee: If any payment is received more than ten (10) days after it is due, you will be charged five percent (5%) of the payment amount.
Other Terms: Please read this Agreement, including the reverse side, for additional information on security interests, nonpayment, default, and our right to require repayment in full before the scheduled maturity date.

## ITEMIZATION OF AMOUNT FINANCED

1. Cash Price (including any accessories and services) ............................................ $ 19300.00 (1)
2. Total Downpayment = Net Trade-in $ ___ 353.28 ___ + Cash Downpayment $ ___ N/A
   Your Trade-in is a ___ 2001 ___ FORD ___ TAURUS ___ ............. $ 353.28 (2)
                         Year      Make      Model
3. Unpaid Balance of Cash Price (1 minus 2) ............................................ $ 18946.72 (3)
4. Amounts Paid to Others on Your Behalf (Other Charges).
   A. Cost of Optional Credit Insurance for the Term of this Contract Paid to:
   (Name of Insurance Company) ___ N/A
   Credit Life Ins. $ ___ N/A ___ Disability, Accident & Health Ins. $ ___ N/A ___ $ ___ N/A
   B. Cost of Optional Mechanical Repair Insurance Covering Certain Mechanical Repairs Paid to:
   (Name of Insurance Company) ___ $ 1599.00
   C. Cost of Single Interest insurance for the term of this agreement .................... $ 60.00
   D. Sales Taxes Paid to Government Agencies .................................... $ 465.00
   E. Certificate of Title Fees Paid to Government Agencies ............................ $ 114.00
   F. Other Charges (Seller must identify who will receive payment and describe purpose)
   to ___ GREENWOOD CREDIT UNION ___ for ___ SHARE ACCOUNT DEPOSIT ___ $ 5.00
   G. Other Charges (Seller must identify who will receive payment and describe purpose)
   to ___ EAST PROVIDENCE MITSUBISHI ___ for ___ DOC FEE ___ $ 75.00
   H. Other Charges (Seller must identify who will receive payment and describe purpose)
   to ___ for ___ GAP INSURANCE ___ $ 355.00
   Total Amounts Paid to Others on Your Behalf (Other Charges) ........................ $ 2673.00 (4)
5. Amount Financed (3 + 4) ............................................................ $ 21619.72 (5)

Ms. Fitts testified that the "Net Trade-In" amount on the RISA of $353.28 was never

explained by EPM.  Ms. Fitts testified that she informed a representative of EPM that the Taurus

was subject to an outstanding loan of approximately $10,000 and that she understood EPM would

pay the loan on the Taurus.  Ms. Fitts signed a "negative equity disclosure" statement that

identified the negative equity in the Taurus as $4,500.  Exhibit 2.  Ms. Fitts could not remember if

anyone at the dealership lead her to believe she was going to receive credit for the Taurus in

3

addition to the $10,000 owed on it.

The owner of EPM, Richard Palumbo, testified that EPM assigned a value of $5,500 to the Taurus and that he informed Plaintiffs of the $5,500 value. Palumbo testified that the $5,500 assigned value of the Taurus was the difference between the anticipated payoff of the loan, $10,000, and the $4,500 negative equity in the Taurus. Palumbo asserted that the $5,500 value assigned to the Taurus was reflected in the credit EPM extended to Plaintiffs and that EPM "allocat[ed] the value of the Taurus to the transaction." Transcript at 65.

Palumbo testified that the actual payoff amount of the loan was $9,646.72. Palumbo explained that the $352.28 figure listed as "Net Trade In" on the RISA was the difference between the estimated payoff amount of the loan on the Taurus, $10,000, and the actual confirmed payoff amount of the loan, $9,646.72. The cash price on the RISA was comprised of the anticipated loan payoff on the Taurus, $10,000, plus $9,300 "from the [Fitts] by cash or financing." Exhibit 6. Palumbo testified that the "selling price" of the Mercedes was $14,800.

## II. Analysis

The parties agree that this transaction is subject to TILA. The purpose of TILA is to promote the "informed use of credit" by consumers. Ritter v. Durand Chevrolet, Inc., 945 F. Supp. 381, 384 (D. Mass. 1996) (internal quotation marks and citation omitted). TILA imposes strict liability on creditors when certain disclosures are not made. Id. TILA requires a "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit. . . ." 15 U.S.C. § 1601(a). A creditor's disclosure obligations are governed by Regulation Z, 12 C.F.R. 226 et. seq.

Santos-Rodriguez v. Doral Mortgage Corp., 485 F.3d 12, (1st Cir. 2007)[1]. TILA requires

creditors to "disclose clearly and accurately all the material terms of a credit transaction." Megitt

v. Indymac Bank, F.S.B., 547 F. Supp. 2d 56, 59 (D. Mass. 2008) (internal quotation marks and

citation omitted). "TILA addresses defects in disclosures related to obtaining credit; it does not

address shortcomings in disclosures related to other aspects of a contract." Slover-Becker v. Pitre

Chrysler Plymouth Jeep of Scotsdale, Inc., 409 F. Supp. 2d 1158, 1163 (D. Ariz. 2005).

   Plaintiffs allege that EPM violated TILA by (1) failing to disclose the negative equity in

the Taurus, and, (2) by disclosing a sales price for the Mercedes that was higher than a cash buyer

would have paid for the Mercedes.  EPM contends that the RISA meets the negative equity

disclosure requirements of TILA and that the sales price of the Mercedes was properly disclosed.

   In essence, Plaintiffs complain about the manner in which the Taurus trade-in was treated

by EPM on the RISA.  Plaintiffs argue that EPM did not give them any credit for the Taurus.

EPM asserts that the value of the Taurus was allocated to the purchase price of the Mercedes.

   The parties agree that Plaintiffs had negative equity in the Taurus.[2]   TILA does not require

that negative equity in a traded-in vehicle be separately disclosed on the RISA. Slover-Becker,

409 F. Supp. 2d 1158.  The staff commentary to Regulation Z specifically addresses the reporting

of negative equity on a traded-in vehicle:

   Content of Disclosures, 18(c) Itemization of Amount Financed

---

[1]Regulation Z was promulgated by the Federal Reserve Board and is "an authoritative interpretation of TILA. The Board-published official staff commentary to regulation Z is dispositive in TILA cases unless the commentary is demonstrably irrational." Carye v. Long Beach Mortgage Co., 470 F. Supp. 2d 3, 6 n.2 (D. Mass. 2007).

[2]"Negative equity is the amount by which the outstanding loan balance exceeds the value of the trade-in vehicle." In re Johnson, 380 B.R. 236, 238 n.2 (Bankr. D. Or. 2007) (internal quotation marks and citation omitted).

Comment 18(c)-2 is revised in response to requests for guidance by creditors offering credit sales when downpayments involve a trade-in and an existing lien that exceeds the value of the trade-in. (See comment 2(a)(18)-3, where a consumer owes $10,000 on an existing automobile loan and the trade-in value of the automobile is $8,000, leaving a $2,000 deficit.)

The amount by which the lien exceeds the trade-in value would be reflected in the amount financed. (See § 226.18(b).) Assuming the cash price for the new car was $20,000, the amount financed would be $22,000 ($20,000 representing the cash price plus $2,000 representing the excess of the lien over the trade-in value financed by the creditor.)

The regulation provides great flexibility for disclosing the itemization of amount financed. Comment 18(c)-2 iii . . . is revised to clarify that any amounts financed by the creditor and representing the excess of the lien over the trade-in value ($2,000 in this example) must appear in the itemization of the amount financed. However, creditors may also add other categories to explain, in this example, the consumer's trade-in value of $8,000, the creditor's payoff of the existing lien of $10,000, and the resulting amount of $2,000 included in the amount financed.

Truth in Lending, 63 Fed. Reg. 16,669, 16,673 (April 6, 1998) (emphasis added).

EPM insists that it did exactly what the staff commentary to regulation Z allows, "namely [it] . . . increas[ed] the sales price on the RISA." Defendant's Post-Trial Memorandum at 4. Plaintiffs argue that a representative from EPM stated that EPM would sell the Mercedes for the same price as the Focus; however Plaintiffs presented no evidence whatsoever as to the price of the Focus. Plaintiffs, however, clearly understood that the Taurus trade-in was part of the purchase price of the Mercedes. Plaintiffs also understood that EPM would be paying off the outstanding lien encumbering the Taurus as part of the purchase of the Mercedes. Consequently, in order for Plaintiffs to be credited with the actual cash value assigned to the Taurus, the outstanding lien on the Taurus had to be paid off.

The record reflects that the actual cash price of the Mercedes was $14,800, which was comprised of $9,300 from the Plaintiffs by cash or financing and the $5,500 figure that EPM assigned as the cash value of the Taurus trade-in. The cash price of $14,800, however, did not

take into account the negative equity of $4,500 in the Taurus. Consequently, EPM increased the

cash price of the Mercedes, $14,800, by the negative equity in the Taurus trade-in, $4,500, and

arrived at a RISA cash price of $19,300. The manner in which EPM treated the negative equity in

the Taurus was consistent with TILA requirements. See generally Slover-Becker, 409 F. Supp. 2d

1158; see also 63 Fed. Reg. at 16,673.

Plaintiffs also argue that EPM violated TILA by "disclosing a sales price for the Mercedes

that was higher than that which a cash buyer would have paid, thereby failing to disclose the true

cost of credit being extended" to Plaintiffs. Complaint at ¶ 22b. Slover-Becker also closes this

purported avenue of relief.

> There was no difference in the amount [Plaintiffs], or anyone else in a comparable
> transaction, would be required to pay [Defendant] for the Mercedes . . . whether the
> transaction was for cash or finance. The increase in the sales price was not a
> product of the fact that [Plaintiffs were] buying the Mercedes on credit . . . it was
> the result of the equity in the [Taurus].

Slover-Becker, 409 F. Supp. 2d at 1163. The "cash price was clearly inflated; however the Staff

Interpretation permits a creditor to include charges that are equally imposed in cash and credit

transactions to be included in the cash price." Id.

Although the theory is not specifically raised in the complaint, Plaintiffs also contend that

the "amount financed" figure on the RISA is "wrong because it was computed by deducting the

fictitious $353.28 from the 'cash price' of the Mercedes in the 'itemization of amount financed'

section of the RISA." Plaintiffs' Post-Trial Memorandum at 4. The transaction was initially

structured based on the understanding that the payoff amount on the Taurus lien was $10,000.

When the lien amount was verified by EPM it was determined to be $9,646.72. Thus, the

difference in the anticipated payoff amount of the loan – which was an integral part of the

calculation of the cash price of the Mercedes – and the actual payoff amount of the loan was

$353.28.  That amount was returned to Plaintiffs as a credit on the RISA.  Although Defendant

could have better explained its treatment of that amount on the RISA, the amount clearly does not

represent a TILA violation; in fact, it was a credit to Plaintiffs reducing the overall purchase price

of the Mercedes, and consequentially the total amount financed.

The Court concludes that Plaintiffs have failed to carry their burden of proving a TILA

violation.  The Clerk is directed to enter judgment in favor of Defendant.

SO ORDERED:

Mary M. Lisi
Chief United States District Judge
February  _3_  2009.